IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ARTHUR LEE BURTON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIV. ACTION NO.4:10-CV-01314 |
| | § | ECF |
| RICK THALER, | § | **CAPITAL LITIGANT** |
| Director, | § | |
| Texas Department of Criminal Justice, | § | U.S. District Judge David Hitner |
| Institutional Division, | § | |
| Respondent. | § | |
| | § | |

## RESPONDENT THALER'S
## ANSWER WITH BRIEF IN SUPPORT

Petitioner Arthur Lee Burton was properly convicted and sentenced to death for the brutal capital murder of Nancy Adleman. CR[1] 3, 67, 85-87. Burton now challenges his conviction and sentence in this Court pursuant to 28 U.S.C. § 2254. However, he has failed to demonstrate that he is entitled to relief. The Director denies all allegations of fact made by Burton except those supported by the record and those specifically admitted herein.[2]

---

[1]     "CR" refers to the Clerk's Record—the transcript of pleadings and documents filed with the clerk during trial—followed by page number.

[2]     An electronic copy of Burton's state court records was mailed to this Court on October 8, 2010.

## PETITIONER'S ALLEGATIONS

In this federal habeas proceeding, Burton alleges five constitutional violations:

1. Burton's Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel were violated when a prison sociologist conducted a classification interview, eliciting incriminating answers without the presence of counsel, when Burton's case was on appeal.

2. Burton was denied his Sixth Amendment right to the effective assistance of counsel because trial counsel failed to properly preserve error for Claim 1.

3. Burton was denied his right of allocution—that is, to present a final statement of remorse, free from cross-examination by the State. Thus, he was denied his Eighth Amendment right to present mitigating evidence.

4. Burton received ineffective assistance of counsel on appeal for counsel's failure to raise Claim 3 on direct appeal.

5. Newly discovered evidence establishes Burton's actual innocence, thus his execution would violate his Fourteenth Amendment right to due process.

However, Burton's claims for relief must be denied. Burton's first claim is procedurally barred for his failure to object and preserve error during trial and is otherwise meritless. Because the first claim has no merit, trial counsel was not ineffective for failing to object to the admission of this evidence, and Burton did not suffer prejudice; thus Claim 2 also fails. Burton's third and fourth claims do not entitle him to relief as he has no right to testify without being subject to

cross-examination.  And since there was no error in the trial court's refusal to allow his testimony free of cross-examination, appellate counsel committed no error in failing to raise this meritless claim on appeal.  Finally, Burton's fifth claim—a free-standing claim of actual innocence—fails because he does not proffer newly discovered evidence or make a "truly persuasive showing" of actual innocence.  For these reasons, as set forth below, relief on all five claims must be denied.

## STATEMENT OF THE CASE

Burton was convicted of capital murder and sentenced to death in June 1998, for the kidnapping, aggravated sexual assault, and strangulation of Nancy Adleman.  CR 3, 67, 85-87.  The Texas Court of Criminal Appeals (CCA) affirmed Burton's conviction but reversed his sentence and remanded the case for a new trial on punishment.[3]  *Burton v. Texas,* No. 73,204, slip op. at 2 (Tex. Crim. App. March 7, 2001).[4]

Burton was again sentenced to death in September 2002.  II Supp. CR 388-90.  On direct appeal of his re-sentencing, the CCA affirmed.  *Burton v. Texas,*

---

[3]      The court found deficient performance from trial counsel's failure to object to the prosecution's jury argument regarding potential parole-eligibility in less than forty years, and found a reasonable probability that, but for counsel's performance, the result of the proceeding would have been different.  *Burton,* No. 73,204, slip op. at 10.

[4]      An opinion was originally delivered October 25, 2000, but was withdrawn and replaced with this opinion.

No. 73,204 (Tex. Crim. App. May 19, 2004) (*Burton II*).

Burton filed his first application for postconviction writ of habeas corpus on July 20, 2000, prior to the CCA's granting a new sentencing hearing.  *See* I SHCR-A[5] 2.  The trial court adopted the State's proposed findings of fact and conclusions of law and recommended denying relief.  V SHCR-A 779.  The CCA adopted those findings and denied relief.  *Ex parte Burton,* WR-64,360-02 (Tex. Crim. App. Nov. 7, 2007).  However, on February 6, 2008, on its own motion, the CCA decided to reconsider this decision.  After further review, the CCA again adopted the trial judge's findings and denied relief.  *Ex parte Burton,* WR-64,360-02 (Tex. Crim. App. April 22, 2009).

Regarding Burton's second application for postconviction writ of habeas corpus appealing the second punishment hearing, the CCA adopted the trial court's findings of fact and conclusions of law on three of the four claims (Claims 1, 3, and 4), but not for Claim 2.  The CCA remanded Claim 2[6] for further review, *Ex parte Burton,* No. AP-75,790 (Tex. Crim. App. June 18, 2008); *see* I SHCR-B at 123-34; but later denied relief.  *Ex parte Burton,* No. AP-75,790, slip op. at 3-4 (Tex. Crim. App. April 1, 2009).

---

[5]   "SHCR-A" refers to the Clerk's Record from the first state habeas writ, while "SHCR-B" refers to the second state habeas writ, filed August 29, 2003.

[6]   The remanded claim alleged a denial of the effective assistance of trial counsel for failure to object at the punishment-phase retrial to testimony by a prison sociologist regarding Burton's admissions during a prison classification interview.

## STATEMENT OF FACTS

## I.   Facts of the Crime and Evidence Related to Punishment

The Court of Criminal Appeals set succinctly forth the facts of the crime and evidence related to punishment in its opinion denying relief on direct appeal:

> Shortly after 7:00 p.m. on July 29, 1997, Nancy Adleman left home to go on a short jog along the bayou near [the Adlemans'] house. Around 7:20 p .m., Sharon Lalen was watching her children play by some heavy equipment near the bayou. When she turned around, she was startled by a dirty and angry-looking man on a bicycle standing very close to her. Lalen said, "Hello," but the man just gave her a mean look. Feeling threatened by the encounter, Lalen called her children and went home. As she was calling her children, Lalen saw Adleman jogging along the bayou. Lalen later identified the man on the bicycle as appellant.
>
> The police discovered Adleman's body the next morning in a hole about three to four feet deep, located in the heavily wooded area off the jogging trail along the bayou. Her shorts and panties had been removed and discarded some distance away from the body, leading the police to believe that she had been sexually assaulted. Adleman had been strangled with her own shoelace, and her body looked as if she had been badly beaten.
>
> When initially approached by Deputy Sheriff Benjamin Beall, appellant denied that he ever rode his bicycle along the bayou, and he denied killing Adleman. Beall confronted appellant with inconsistencies in the evidence he had collected, and appellant eventually confessed to the crime. In his written statement, appellant admitted attacking a jogger, dragging her into the woods, and choking her until she was unconscious. He then removed her shorts and underwear and attempted to have sex with her. When she regained consciousness and began screaming, appellant again choked her into unconsciousness and dragged her into a hole. Appellant began to leave, but when he saw another person walking nearby, he returned and strangled the jogger with her own shoelace.
>
> In addition to the facts of the crime, the state presented

evidence that, in 1988, when appellant was eighteen, he had participated in thirty-nine burglaries of vehicles and outbuildings in a single month. Appellant and his co-defendants had stolen guns, radios, fishing equipment, calculators, and other items. At times, the perpetrators would not take anything; they would just go through any papers in the car and then destroy the inside of the vehicle. Finally, appellant's brother testified that he knew that appellant used marijuana and sold cocaine when appellant lived in Arkansas.

*Burton II,* slip op. at 2-3.

The defense was able to elicit on cross-examination evidence that Burton showed some remorse when confessing to the crime, 15 RR[7] 193-94, 205-07, and that he has not been a disciplinary problem the entire time he has been housed at TDCJ—approximately three years.  16 RR 106.  The defense also presented evidence that, if given a life sentence, Burton would be confined to a maximum security prison and showed the jury a video of what the prison would be like and the sort of controls Burton would face.  16 RR 118-34.  The jury heard that Burton had been in prison for almost five years with no disciplinary violations. 16 RR 134-35.  Also, the jury heard that criminal activity tends to decrease with age.  16 RR 135-36.

An educational diagnostician reviewed Burton's school records and testified regarding the decline in Burton's grades over the years.    The

---

[7]     "RR" refers to the Reporter's Record from Burton's punishment-phase retrial.

diagnostician noted that, despite the frustration that is likely to arise from this sort of situation, there were no disciplinary problems noted in Burton's records. 16 RR 170.  Burton's grades did show improvement after he repeated two grade levels and was placed in a developmental reading class, and the diagnostician opined that Burton benefitted from maturity.  16 RR 171.

Burton's brother, Michael Burton, testified that their father was not a part of their lives growing up.  16 RR 185-86.  Michael could recall periods of time when they were on welfare as children and went without food or electricity.  16 RR 187-88.  Michael discussed how they had both moved to Houston to live and work with their father after high school, 16 RR 191-94; told the jury that Burton was common-law married and had three children and a step-child, 16 RR 194; and that Burton worked hard, supported his family, and was a good father, 16 RR 196-98.  Michael testified that he had never known Burton to be physically violent or abusive.  16 RR 199-201.

Burton's mother, Fannie Burton, testified that she separated from Burton's father when her children were young and that she and her mother provided for them.  16 RR 228-29.  Fannie described pictures of Burton as a child, 16 RR 229-31, and testified that he loved to build things, 16 RR 233. While in prison, Burton sent his mother and nieces several of his drawings—a hobby he had as a child.  16 RR 233-335.

Burton's common-law wife, Felicia Batts, testified that they had been together for almost eight years.  16 RR 236.  Batts described Burton as a very sweet person who treated her son like he was his own.  16 RR 237.  The jury saw pictures of Batts's and Burton's four children.  16 RR 239-42.  Batts testified that Burton was very involved in their children's lives, that they visit him in prison, and that, even under these circumstances, he could still make a difference in their lives.  16 RR 242-43.  On cross-examination, Batts admitted that nothing unusual happened in the week before the killing that would have angered or upset Burton.  16 RR 246.  Further, on the night of the murder, Burton returned to the home with a flat tire on his bicycle; Burton was laughing and seemed normal.  16 RR 247-51.

Before resting, defense counsel informed the jury that, present in the courtroom were five other family members who would provide testimony cumulative of that already presented.  16 RR 252.

## ANSWER

Burton, confined pursuant to a state court judgment, is entitled to federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under AEDPA, a federal reviewing court cannot grant relief for claims which were adjudicated on the merits in state court unless the adjudication:

-8-

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).  This provision establishes standards that foreclose relief based on each of the three different questions on which a state judicial decision may rest on the merits, i.e., questions of fact, questions of law, and mixed questions of law and fact.  *See Williams v. Taylor,* 529 U.S. 362, 405-06 (2000); *Dowthitt v. Johnson,* 230 F.3d 733, 740-41 (5th Cir. 2000).

As to questions of law, a decision is contrary to clearly established Federal law[8] if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Williams*, 529 U.S. at 405-06; *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (*Penry II*).  Alternatively, when confronting a mixed question of law and fact, a state court "unreasonably" applies clearly established Federal law "if the state court

---

[8]     "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing *Williams*, 529 U.S. at 412). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* at 71-72 (citing *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Penry II*, 532 U.S. at 792; *see Williams*, 529 U.S. at 407-09.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams,* 529 U.S. at 409-11; *Tucker v. Johnson,* 242 F.3d 617, 620 (5th Cir. 2001). Rather, federal relief is merited only where the state court decision is both incorrect *and* objectively unreasonable, "[w]hether or not [this Court] would reach the same conclusion." *Woodford v. Visciotti,* 537 U.S. 19, 27 (2002); *Martin v. Cain,* 246 F.3d 471, 476 (5th Cir. 2001) (reiterating that relief is appropriate only where state court decision is both incorrect *and* objectively unreasonable). In other words, relief is *inappropriate* when a state court, at a minimum, reaches a "satisfactory conclusion." *Williams,* 529 U.S. at 411 (citing *Wright v. West,* 505 U.S. 277, 287 (1992)).

Further, it is the state court's "ultimate decision" that is to be tested for reasonableness, "not every jot of its reasoning." *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *see Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application'

test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence").  And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the state result does not contradict Supreme Court precedent).

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Dowthitt*, 230 F.3d at 741.  This presumption of correctness applies to explicit and implicit findings that are necessary to the state court's conclusions of mixed law and fact and to the state court's credibility determinations.  *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which an applicant would challenge a state-court fact finding must have been presented to the state court.  Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," it follows that demonstrating the incorrectness of a state court fact

finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2) (emphasis added).

In addition, habeas relief is foreclosed if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

## I. Admissions From Burton's Prison-Classification Interview Were Properly Admitted During Punishment-Retrial, and a *Strickland*[9] Violation Did Not Occur From Trial Counsel's Failure to Object.   (Claim 1 and 2)

After Burton's conviction and first sentencing hearing, he was transferred to TDCJ where he submitted to a classification interview conducted by a prison sociologist, J.P. Guyton.  16 RR 88-96.  According to Guyton, all inmates entering TDCJ from county jail are interviewed to compile a social and criminal history.  16 RR 89, 96-102.  The purpose of the interview was for prison classification to ensure the public safety of prison staff, other inmates, and Burton.  16 RR 89-91, 103-04.  When conducting a classification interview, Guyton testified that he

---

[9]      *Strickland v. Washington,* 466 U.S. 668 (1984)

asked the same questions, in the same order, for each interview.  16 RR 98.  At the end of the examination, Guyton asked Burton the standard question, "Our records indicate that you did this [crime].  Can you tell me why you did that?" to which Burton responded, "Just something I couldn't help."  16 RR 101-02.  This statement was later admitted against Burton during his punishment phase retrial.

Burton complains that because the sociologist performed this interview and elicited this incriminating answer without the presence of his appellate counsel, while Burton's case was still on appeal, Burton's statement indicating the crime was "[j]ust something [he] couldn't help" was the product of custodial interrogation and admitted in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel  Petition at 12-13.  In a related claim, Burton argues he was denied his Sixth Amendment right to the effective assistance of counsel because trial counsel failed to properly preserve this error with regard to his first claim.  Petition at 38.

### A.    Burton's 5th and 6th Amendment claim is procedurally barred and otherwise meritless.

Burton raised this claim on direct appeal.  The CCA denied relief, finding that any complaint about the admissibility of this information was not preserved for appeal because Burton confined his trial objections to the admissibility of two extraneous offenses mentioned during the interview.  *Burton II,* slip op. at 6.

-13-

Burton raised this claim again on state habeas review. That court also concluded that, because Burton did not object to the admission of this statement at the trial-level, Burton has waived this ground for relief. I SHCR-B 129, #2; *see also id.* at 125, #14-16; 126, #20. Alternatively, the state habeas court concluded that the trial court properly admitted this testimony because the prison classification interview did not constitute an interrogation requiring the administration of *Miranda*[10] warnings. I SHCR-B 129, #3; *see also id.* at 125-26, #17-19. The court found (upon further consideration of Burton's *Strickland* claim) that the classification interview did not constitute "custody" for *Miranda* purposes, *Miranda* warnings were not required prior to the interview, and Guyton was not an agent of the State thus necessitating *Miranda* warnings. I SHCR-B at 191, #39; *id.* at 192-93, #1-4. Finally, any error in the admission of Guyton's testimony was harmless. I SHCR-B at 194, #6. These findings are entitled to deference under the AEDPA.

### 1.     This claim is procedurally barred.

This claim is procedurally barred from federal habeas review as a consequence of Burton's failure to comply with state procedural rules for preserving error. *See Granviel v. State*, 552 S.W.2d 107, 118 (Tex. Crim. App. 1976) (preservation of error for review on appeal requires a defendant to object

---

[10]     *Miranda v. Arizona,* 384 U.S. 436 (1966)

in a timely and specific manner); *see* Tex. R. App. P. 33.1.   This "contemporaneous objection rule" is  strictly and regularly applied to similar claims in Texas and is therefore an adequate and independent state ground sufficient to bar review in federal court. *See Rowell v. Dretke,* 398 F.3d 370, 375-75 (5th Cir. 2005) (holding defendant's failure to timely object to alleged errors in jury charge determined by Texas appellate court to be violation of contemporaneous objection rule barred federal habeas relief of alleged erroneous jury charge under procedural default doctrine); *see also Graves v. Cockrell,* 351 F.3d 143, 152 (5th Cir. 2003).

On both direct appeal and state habeas review, the CCA denied relief, finding that any complaint about the admissibility of this information was not preserved for appeal because Burton failed to specifically object to this complaint.  *See Burton II,* slip op. at 6; I SHCR-B at 126, #20; 129, #2.  This finding is supported by the record.  Prior to the punishment retrial, trial counsel filed a motion to suppress Burton's confession, including "any and all statements or acts," SUPP.CR[11] at 78; however, this motion was withdrawn by counsel in open court, SUPP.CR at 81.  Prior to the admission of Guyton's testimony at retrial, trial counsel objected, but only to testimony regarding Burton's

---

[11]     "SUPP.CR" refers to the Clerk's Record from the retrial of Burton's punishment phase.

admission that he started using marijuana at age sixteen and selling cocaine at age seventeen.  16 RR 35.  Counsel objected to the admission of these extraneous offenses obtained through interrogation, without the benefit of counsel.  16 RR 36.  After hearing testimony—outside the jury's presence—from Guyton regarding the prison-classification interview process, the trial court overruled trial counsel's objections.  16 RR 42-46.  Trial counsel then made one final argument:

> Judge, . . . I just want to make sure I made all my objections clear on Mr. Guyton's testimony as to the extraneous offense.  We argue that it's not an offense which they can prove, they can't make the test, as required by case law, as the Court is well aware, to be able to offer that admission.  In addition, it's hearsay.  And for those reasons we object.

16 RR 47.  The trial court once again overruled the objection.  *Id.*  Trial counsel never objected to the admission of Burton's statement that the crime was "Just something I couldn't help."

Therefore, federal habeas corpus review is foreclosed unless Burton demonstrates either cause for the default and actual prejudice resulting therefrom, or that failure to consider the claim would result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 749-50; *Jones v. Johnson,* 171 F.3d 270, 277 (5th Cir. 1999) (citing *Keeney v. Tamayo-Reyes,* 504 U.S. 1 (1992)). While Burton now raises a *Strickland* claim on counsel's failure to object, he does not specifically allege deficient performance as cause to excuse the procedural

default.  Regardless, as will be discussed below, trial counsel's performance was not deficient, and Burton cannot demonstrate prejudice because any error from the admission of this evidence was harmless.

Furthermore, there is no miscarriage of justice because Burton is not actually innocence.  For purported punishment-phase error, a miscarriage of justice occurs if clear and convincing evidence establishes that, "but for the constitutional error at [Burton's] sentencing hearing, no reasonable juror would have found him eligible for the death penalty" under state law.  *Sawyer v. Whitley,* 505 U.S. 333, 350 (1992).   This exception requires evidence of "innocence of the capital crime itself," i.e., "a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met."  *Id.* at 336, 345.  Such a showing would require evidence that Burton did not sexually assault or kill the victim, or reliable evidence proving a lack of future dangerousness. As discussed in Section III, *infra*, Burton's claim of actual innocence of the crime is unpersuasive.  Further, as discussed below, the State presented sufficient evidence of future dangerousness.  Therefore this exception does not apply and this claim should be dismissed as procedurally barred.

### 2.    This claim is meritless.

The trial court properly admitted Guyton's testimony because the prison classification interview was not a custodial interrogation requiring *Miranda*

warnings or the presence of counsel.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." *McKune v. Lile,* 536 U.S. 24, 35 (2002). Therefore, the State many not use statements resulting from a defendant's custodial interrogation, unless the State shows that the defendant received procedural safeguards effective to secure the privilege against self-incrimination. *Miranda,* 384 U.S. at 444. However, for *Miranda* safeguards to apply, two elements must be present: (1) The suspect must have been "in custody," and (2) the police must have "interrogated" the suspect either by express questioning or its functional equivalent. *See Rhode Island v. Innis,* 446 U.S. 291, 300-02 (1980). "Custodial interrogation" is described as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." *Estelle v. Smith*, 451 U.S. 454, 469 (1981). Under the Sixth Amendment, "a person is entitled to the help of a lawyer 'at or after the time that adversary judicial proceedings have been initiated against him . . . whether by way of formal charge, preliminary hearing, indictment, or arraignment.'"

*Estelle,* 451 U.S. at 469-70 (citing *Kirby v. Illinois,* 406 U.S. 682, 688-89 (1972)). Central to the Sixth Amendment is a guarantee that the accused not stand alone against the State at any stage of the prosecution "where counsel's absence might derogate from the accused's right to a fair trial." *Estelle,* 451 U.S. at 470 (citing *United States v. Wade,* 388 U.S. 218, 226-29 (1967)).

As found by the state court, this was not "custodial interrogation," as anticipated by *Miranda*, so the protections of the Fifth and Sixth Amendments were not implicated. The extensive findings of the state courts are entitled to deference.

### a.    Guyton was not an agent of the State.

First, Guyton was not an agent of the State so that his questions potentially amounted to a "custodial interrogation." Burton argues that sociologist, J.P. Guyton, was a "state agent" because it was his job to gather sociological data from the prison inmates. Therefore, when he asked Burton a question regarding this offense, he not only exceeded the scope of his job but was required to give *Miranda* warnings. Petition at 15-19.

The state court rejected this argument, after receiving additional briefing on the subject, finding that Guyton was a civilian employee who was not employed to arrest or investigate for TDCJ, was not paid to discover and investigate criminal activity, and was not a law enforcement officer with the

power to arrest.  I SHCR-B at 190-91, #33.  Further, Guyton's questions were not calculated to invoke incriminating responses to pending charges.  I SHCR-B at 191, #34.  The court concluded that Burton failed to show that Guyton "was acting as an agent of the State so that *Miranda* warnings were required prior to [Burton's] routine prison classification interview consisting of questions that were not calculated to invoke incriminating responses and that were asked by someone whose function was to be a 'passive listening post,' rather than an investigator of criminal activities."  I SHCR-B at 192, #1.  These findings are not unreasonable and are entitled to deference.

Burton cites no authority to support his position that a civilian employee conducting a standard classification interview is somehow a "state agent" for the purposes of *Miranda* warnings.  However, CCA and Fifth Circuit hold to the contrary.  While Guyton was an employee of the State and thus a "state agent" by definition, he was not an agent whose interview of Burton necessitated *Miranda* warnings.  The CCA has held,

> [t]here are two types of "state agents": all those who are employed by any state agency are, by definition, "state agents," but only those who are working for or on behalf of police are law-enforcement "state agents."  Although state employment clearly makes a person an "agent of the State," that label does not, by itself, make the person an "agent of the State" for the purpose of defining "custodial interrogation."  Not all government workers must be familiar with and ready to administer *Miranda* warnings or comply with the procedural requirements of Article 38.22. As noted by Professor LaFave, when "the official has not been given police powers,

> *Miranda* has been held inapplicable to questioning by school officials, welfare investigators, medical personnel, prison counselors, and parole or probation officers."

*Wilkerson v. State*, 173 S.W.3d 521, 527-28 (Tex. Crim. App. 2005) (internal citations and footnotes omitted). "[A] state employee must be acting as an agent of law enforcement pursuant to a police practice before the safeguards attendant to custodial interrogation come into play." *Paez v. State*, 681 S.W.2d 34, 37 (Tex. Crim. App. 1984). Only then will "non-law enforcement personnel become agents of the *State* for purposes of distinguishing custodial interrogation from non-custodial interrogation." *Id.* These cases conform with *Innis*, which indicates custodial interrogation encompasses only police practices. 446 U.S. at 298-302; *Paez,* 681 S.W.2d at 37. Essentially, an agency relationship exists when non-law enforcement personnel are used to accomplish what the police could not have lawfully accomplished themselves. *Paez,* 681 S.W.2d at 37.

The Fifth Circuit similarly declined to find a non-law enforcement person was a state agent. In *Powell,* the Fifth Circuit concluded an emergency room doctor—who conducted an examination of the defendant at the behest of police personnel who were present during the examination, and who elicited incriminating statements regarding the defendant's drug usage, and subsequently testified for the State—was not an agent of the State as anticipated by *Estelle*. *Powell v. Quarterman,* 536 F.3d 325, 343 (5th Cir. 2008).

-21-

The court reasoned that, unlike *Estelle,* the doctor was not court-appointed, was not a psychiatrist, and did not provide psychiatric opinion. *Id.*

Pursuant to this authority, Guyton was not an agent of the State. Guyton did not interview Burton for the purposes of investigating this case or testifying at trial and was not under court-order to do so. Guyton was not attempting to uncover information that the police were unable to uncover for investigative purposes. Rather, Burton had been tried, convicted, and sentenced to death, and presumably any investigation into his case was over. Guyton was a "state agent" only in terms of his employment with a state agency. Guyton possessed no law-enforcement powers or authority and had no reason to believe that the information obtained from his interview would be used against Burton a some point in the future. Therefore, the state court correctly determined that he was not a "state agent" whose interview necessitated *Miranda* warnings.

### b.   Burton was not in "custody" for *Miranda* purposes.

The intake interview did not amount to "custody" for *Miranda* purposes. An "in-custody" determination generally requires two inquiries: 1) What were the circumstances surrounding the interrogation; and 2) given those circumstances, would a reasonable person have felt he or she was not at liberty to leave. *Thomas v. Keohane,* 516 U.S. 99, 112 (1995); *United States v. Chavez,* 281 F.3d 479, 486 (5th Cir. 2002); *United States v. Lugo,* 289 F.Supp.2d 790, 796

(S.D. Tex. Oct. 23, 2003); *Herrera v. State*, 241 S.W.3d 520, 532 (Tex. Crim. App. Nov. 21. 2007).

As an initial matter, the mere fact that Burton was in custody in TDCJ did not make this a "custodial interrogation." Burton cites *Mathis v. United States*, 391 U.S. 1 (1968) to support this proposition. Petition at 20-22. *Mathis* holds "that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 391 U.S. at 5. However, the CCA, the Fifth Circuit, and other reviewing courts have since concluded that there is no per se rule that incarcerated individuals are automatically entitled to *Miranda* warnings prior to any interrogation. *See Herrera*, 241 S.W.3d at 527-28, 531 ("... *Mathis* does not hold that *Miranda* warnings must precede all inmate interrogations."); *United States v. Smith,* 7 F.3d 1164, 1167 (5th Cir. 1993) (a prison inmate is not automatically in custody, within the meaning of *Miranda*); *see also Lugo,* 289 F. Supp. 2d at 795-96 ("[N]ot every question asked in a custodial setting constitutes an interrogation for *Miranda* purposes.").

The Supreme Court even acknowledged, in dicta, that "custody may not in every instance require a warning[.]" *Illinois v. Perkins,* 496 U.S. 292, 299 (1990). And in *McKune v. Lile*, the Supreme Court held that the Fifth

Amendment was not violated by a prison rehabilitative program, requiring offenders to admit that they committed the crime in order to receive incentives, because the program served a vital penological purpose.  536 U.S. 24, 29 (2002). This was so even though the admission of crime was not privileged, and the new evidence could potentially—although not likely—result in future criminal proceedings.  *Id.* at 30.  "[A] valid conviction and the ensuing restrictions on liberty are essential to the Fifth Amendment analysis."  *Id.* at 36.  "A broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions of confinement of those who have suffered a lawful conviction."  *Id.*  The Supreme Court recognized that prisoners' privileges and rights may be limited to accommodate the need to grant prison officials necessary authority to administer the prison.  *Id.* at 37.

Thus, Burton's confinement alone does not render the sociological interview a "custodial interrogation."  *See* I SHCR-B at 192, #2.  However, the *Herrera* court recognized that the "free to leave" standard was not necessarily a useful tool to use in evaluating situations involving a prison interrogation.  341 S.W.3d at 528-29.  Therefore, the CCA amended the analysis to 1) require an evaluation of the circumstances surrounding the interrogation, and 2) a determination whether, given those circumstances, a reasonable person would feel he was at liberty to terminate the interrogation and leave.  *Id.* at 532. An

-24-

examination of the circumstances should include the language used to summon the inmate; the physical surroundings of the interrogation; the extent to which the inmate is confronted with evidence of his guilt; additional pressure exerted to detain the inmate or the change in surroundings of the inmate; and the inmate's freedom to leave the scene as well as the purpose, place, and length of questioning. *Herrera,* 241 S.W.3d at 532 (relying on *United States v. Menzer,* 29 F.3d 1223, 1231-33 (7th Cir. 1994), and *Cervantes v. Walker*, 589 F.2d 424, 426-27 (9th Cir. 1978)).

Applying the *Herrera* standard, the state court reasonably concluded during the routine prison interview, Burton was not in custody beyond his incarceration for capital murder. I SHCR-B at 192-93, #2-4; *see also id.* at 188-91, #22-39. The state court ultimately concluded that Burton failed to show he was in custody "based on the non-threatening 'language used to summon' him, the non-oppressive physical surrounding of the interview, the lack of confrontation of evidence of his guilt, the lack of additional pressure exerted to detain [Burton], and [Burton's] freedom to refuse to participate in the interview and the purpose, place and length of the interview." I SHCR-B at193, #3. These findings are not unreasonable and are supported by the evidence submitted during the state habeas proceeding, as well as trial. *See* I SHCR-B at 188-91, #22-39. The circumstances surrounding Burton's interview would not have led

a reasonable person to believe Burton was not at liberty to leave the interrogation.  *Thomas,* 516 U.S. at 112; *Herrera,* 241 S.W.3d at 532.

According to the affidavit of Robert Compton, the Assistant Intake Administrator of TDCJ, the purpose of the intake interview is to collect information from the inmate to use in making classification decisions in order to maintain the safety of the public, staff, and offenders.  I SHCR-B at 195;[12] *see also* 16 RR 89-91, 103-04 (J.P. Guyton).  This purpose is explained to the inmate. I SHCR-B at 195.  The interviewer follows a set form of questions for all interviews, and the sociology portion of the interview takes approximately thirty minutes.  *Id.* at 196; 16 RR 98 (Guyton asked the same questions he always asks).  The sociology portion is conducted in a room with a glass partition separating the sociologist and the inmate, with a telephone receiver for communication.   I SHCR-B at 196.  Only the sociologist and the inmate are present during the interview.  *Id.*  There are no weapons in the room, the interviewer is not permitted to threaten the inmate or have any physical contact with the inmate, and the interviewer has no authority to arrest the inmate or

---

[12]      While Compton's affidavit differs from Burton's, *see* I SHCR-B at 195-98 (Compton), 179 (Burton), the state court found Compton's affidavit to be credible.  I SHCR-B at 188-90.  *See Summers v. Dretke*, 431 F.3d 861, 871-72 (5th Cir. 2005) (state court credibility determinations are afforded deference under AEDPA); *Pippin v. Dretke*, 434 F.3d 782, 791 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts.")

charge him with a criminal offense. *Id.* There is no punitive action taken if the inmate refuses to answer a question or cooperate, rather, the interview is terminated. *Id.* at 197. The interviewer does not comment or offer opinions on the inmate's guilt or innocence—other than noting he has been found guilty—and the interviewer does not confront the inmate with evidence of his guilt if the inmate denies culpability. *Id.* Regarding restraints, Compton stated "Offenders on death row . . . are routinely handcuffed while being escorted from one location to another. In light of this, when escorting an offender to the interview, the offender will be handcuffed." *Id.* The offender remains handcuffed during other parts of the intake interview but is unrestrained during the sociology interview. *Id.*

Given these circumstances, a reasonable person would have assumed he was able to terminate the interview or at least refuse to answer questions. The restraint imposed on this situation was no more restrictive "than that found in a traditional prison setting." *Lugo,* 289 F. Supp. 2d at 796. No prison guards or weapons are present during the interview, and while death row inmates are routinely handcuffed for transport and remain handcuffed during other portions of the interview, during the sociology portion of the interview those restraints are removed. I SHCR-B at 197. Thus, the sociology interview is less restrictive than a traditional prison setting and certainly provides no added imposition on

-27-

the inmates freedom of movement.

Furthermore, apart from noting the inmate's guilt and asking why he committed the crime, the interviewer does not confront the inmate with *evidence* of his guilt.  The inmate is certainly free to deny guilt and will not be questioned further about his answer.  I SHCR-B at 197.  Moreover, as noted in the previous section, the interviewer is not an "agent" of the State for the purposes of investigating this case.  Thus, the interviewer does not threaten the inmate and has no authority to bring any additional charges.  The inmate is informed of the purpose of the interview, asked standard questions, and interviewed for approximately thirty minutes.  If the inmate refuses to answer questions, the interview is terminated without consequence.  This is not the sort of questioning necessitating *Miranda* warnings.  No evidence suggests that this interview was conducted for the purpose of investigating or compiling evidence for the State's potential future case against Burton.

The *Herrera* decision, upon which the state court relied in denying relief, differs from the situation at hand in that the CCA held incarceration does not automatically equal custody for *Miranda* purposes when an inmate is questioned "regarding an offense *separate and distinct* from the offense for which he was incarcerated." 241 S.W.3d at 531 (emphasis added) (citing *Menzer,* 29 F.3d at 1231).  However, *Herrera* and the majority of the cases relied upon by the CCA

in reaching that decision, *see* 241 S.W.3d at 527 n.37, involve routine questioning by prison personnel where charges could potentially and did result. The *Herrera* court, and many of the others upon which the CCA relied, nevertheless ruled that *Miranda* was not violated, even though charges did ultimately come from the questioning.  In Burton's case, the intake interview question involved a crime for which Burton had already been tried, convicted, and sentenced.  Burton was even less likely to be impacted by the intake interview question—the question had no investigatory purpose and no likelihood of resulting in additional charges.  Indeed, the sociologist had no authority to seek charges for anything Burton said.  Thus, the potential impact on Burton's Fifth and Sixth Amendment rights was even less than in *Herrera* et al.*, where the various courts have ruled that no constitutional violation arose from questioning while in custody.

Burton was not in custody for the purposes of *Miranda* warnings, as he was placed under less restraint than he would normally face as a death row inmate and was free to end the sociological interview at any time.  The circumstances surrounding this interview do not suggest that his Fifth Amendment rights were violated or that he was in need of counsel at the time of the interview.

### c.   Burton was not interrogated.

This interview also did not amount to an interrogation.  Not every question asked in a custodial setting constitutes an interrogation.  Rather, "[t]he term 'interrogation' refers to '[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Lugo,* 289 F. Supp. 2d at 795 (quoting *Innis,* 446 U.S. at 301).  The Supreme Court has recognized an exception to *Miranda* for "routine booking questions." *Pennsylvania v. Muniz,* 496 U.S. 582, 601-02 (1990); *Lugo,* 289 F. Supp. 2d at 797 n.4.   And the Fifth Circuit has held that "biographical questions that are part of the booking routine and that are not intended to elicit damaging statements are not interrogation for Fifth Amendment purposes." *Gladden v. Roach,* 864 F.2d 1196, 1198 (5th Cir. 1989).  The state habeas court correctly concluded that this was not an interrogation requiring *Miranda* warnings.  I SHCR-B at 129, #3.  This finding is not unreasonable and is supported by the record.

In this case, the question, "Our records indicate that you did this [crime]. Can you tell me why you did that?" was a routine booking question, presented to every inmate during the classification interview.  16 RR 98, 101-02; I SHCR-B at 196.  And while asking a suspect why he committed a crime is reasonably likely to invoke an incriminating response from a suspect under *investigation* for a crime, Burton was no longer under investigation.  He was a convicted capital

murder undergoing a processing interview for TDCJ.  Therefore, under these circumstances, there was no reason for the interviewer to believe he was reasonably likely to evoke an incriminating response.  *See Lugo,* 289 F. Supp. 2d at 798 ("[A] situation where the individual asking questions has reason to believe that prosecution will result from the information he or she is gathering is more likely to require a *Miranda* warning prior to questioning because, based on the nature of the questions, certain answers should be reasonably expected to lead to prosecution — thus making the answers, by definition, incriminatory.") *see also Gladden*, 864 F.2d at 1198 (holding no absolute right to remain silent under the Fifth Amendment, noting, "[w]hile it is conceivable that questions about a person's identity or residence could be incriminating, or lead to incriminating information, on the facts of this case such statements were not incriminating.")

Moreover, as discussed in the first section, *see* I(A)(2)(a), *supra,* Guyton was not an agent of the State or law enforcement personnel.  *Innis* suggests that interrogation comes only at the hands of the police or, the very least, a police agent.  *See* 446 U.S. at 300-02.  Guyton was neither.  The sociological interview was nothing more than an interview, which Burton could refuse to answer.  The State court reasonably concluded that there was no interrogation.

### d. *Estelle v. Smith* does not require relief.

Burton relies on *Estelle v. Smith* to support both his Fifth and Sixth Amendment arguments. Petition at 32-34. However, *Estelle* is distinguishable from Burton's case and does not demand relief. In *Estelle,* the Supreme Court held that, when faced with a court-ordered psychiatric examination, a defendant's statements were not voluntarily given and could not be used against him during the punishment phase of trial unless the defendant had been apprised of his rights and knowingly decided to waive them. 451 U.S. at 469.

However, the Supreme Court refused to hold that "the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination." *Estelle,* 451 U.S. at 469 n.13. The Fifth Circuit has limited *Estelle* to the facts of that particular case. In *Powell v. Quarterman,* the Fifth Circuit declined to find a Fifth Amendment violation from the admission of testimony by an emergency room doctor who examined Powell at the behest of, and in front of, the police. 536 F.3d at 341-44. The doctor testified at trial that he obtained a medical history and conducted a physical and mental examination, that Powell did not appear under the influence of drugs and denied using them, and that Powell was oriented to place and person. *Id.* at 341. Powell argued that, pursuant to *Estelle*, he should have been given *Miranda* warnings prior to

-32-

questioning regarding his illegal drug use.  The Fifth Circuit disagreed, holding that the doctor was not acting as an agent of the State when he performed the examination, and the doctor "was not court-appointed, he was not a psychiatrist, he did not conduct a psychiatric examination, and he did not express an opinion at trial regarding Powell's psychiatric condition." *Id.* at 343.  *Estelle* can be similarly distinguished from the case at hand in that the intake examination was not a court-ordered exam of any kind. Moreover Guyton was not an agent of the State—like the emergency room doctor in *Powell,* he had no investigative or prosecutorial role whatsoever.  Further, as discussed, this was not a custodial setting.  Burton was free to refuse to answer the questions, and the interview would be terminated at any time, without consequence.

*Coble v. Quarterman,* 496 F.3d 430 (5th Cir. 2007), is also instructive. Coble contended that the admission during the penalty phase of a 1964 psychiatric report from a doctor's consultation with Coble when he was fifteen in which he admitted several illegal actions violated his Fifth Amendment rights, as articulated in *Estelle*. *Coble,* 496 F.3d at 440.  The court found Coble's claim that the report violated his Fifth Amendment rights in 1964 meritless because the psychiatric consultation was not a custodial interrogation. *Id.* Rather, his statements were for the purpose of medical and psychiatric diagnosis. "Unlike the defendant in *Estelle*, Coble was not 'faced with a phase

of the adversary system,' but was 'in the presence of [a] perso[n] acting solely in his interest.'" *Id.* (citing *Estelle*, 451 U.S. at 467-69 ).  Therefore, the report did not violate his Fifth Amendment right.  While Guyton was not acting in Burton's sole interest, he was acting in the interest of the prison population in general. More importantly Guyton was not investigating the case pursuant to a court-ordered custodial interrogation. Like Coble, Burton was no longer facing a phase of the adversarial process when he was interviewed, and the interview was not conducted for that purpose.

Regarding the Sixth Amendment, *Estelle* requires that, once the right to counsel has attached, the defendant must have counsel at any "critical stage" of the aggregate proceedings against him—specifically, any adversary judicial proceeding initiated against him.  451 U.S. at 470.  The Sixth Amendment guarantees that the defendant "need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Id.* at 470 (citing *United States v. Wade,* 388 U.S. 218, 226-27 (1967)).  However, Burton provides no authority suggesting he had a constitutional right to have counsel present at a post-trial intake interview.

Regardless, unlike *Estelle,* this was not a "critical stage" of the proceedings against Burton.  451 U.S. at 470-71.  The Supreme Court noted that the decision

whether to submit to a psychiatric evaluation is "literally a life or death matter," which requires knowledge of available evidence, the psychiatrist's biases and predilections, and possible alternative strategies at the sentencing hearing. *Id.* at 471. "[A] defendant should not be forced to resolve such an important issue without 'the guiding hand of counsel.'" *Id.* at 471 (citing *Powell v. Alabama,* 287 U.S. 45, 69 (1932)). The same cannot be said for an intake interview. The interview was not a court-ordered process—if the inmate refuses to answer questions, the interview is terminated. And the decision whether to submit to such an interview could rarely be described as "life or death" given that the trial is over and the defendant has already been convicted and sentenced to death. Furthermore, the interview is standard procedure and not a "critical stage" of the aggregate proceedings against Burton. *Estelle,* 451 U.S. at 470. The fact that information was obtained that was used against Burton when he subsequently obtained a new sentencing proceedings does not transform this situation into one that would normally require *Miranda* warnings. *See Maine v. Moulton*, 474 U.S. 159, 176 (1985) ("[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached.")

As noted by the state habeas court, Guyton was a civilian employee who was not employed to arrest or investigate for TDCJ, was not paid to discover and

investigate criminal activity, and was not a law enforcement officer with the power to arrest.   I SHCR-B at 190-91, #32, 33.   Further, Guyton's questions were not calculated to invoke incriminating responses to pending charges. I SHCR-B at 191, #34.   Burton fails to demonstrate any violation of his Fifth or Sixth Amendment rights from the admission of Guyton's testimony at his punishment retrial.

e.    <strong>Any error was harmless.</strong>

Given the evidence outlined above, any error in the admission of Guyton's testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict" and was harmless under *Brecht*, 507 U.S. at 637; *United States v. Jones,* 239 F.3d 716,722 (5th Cir. 2001).   The jury heard the brutal facts of the crime.   They heard that Burton showed no remorse immediately following the crime—Burton was laughing and seemed normal, 16 RR 247-51—and during his confession he was generally unemotional, choking up only one time.  15 RR 205-07.  Finally the jury heard evidence of his criminal record.  The jury was unmoved by Burton's evidence that he had been in prison for almost five years with no disciplinary violations, 16 RR 134-35; that criminal activity tends to decrease with age, 16 RR 135-36; and that he benefitted from maturity, 16 RR 171; that he was a good father, 16 RR 196-98, 237; and that even under these circumstances, he could still make a difference in the lives of

his children, 16 RR 242-43.  Therefore, in light of this evidence, the admission of the statement that the murder was "[j]ust something I couldn't help" was unlikely to have had a substantial and injurious effect on the jury's verdict.

**B.    Trial counsel was not ineffective, nor was Burton prejudiced.**

While Burton disagrees that counsel failed to adequately preserve the record with respect to Claim 1, in the event this Court agrees with the state court, Burton argues that counsel was ineffective for failing to properly preserve error.  Petition at 38-45.

Burton also raised this claim on state habeas review.  The CCA refused to adopt the trial court's proposed findings of fact and conclusions of law for this claim.  *See* I SHCR-B at 125-26, 129-30 (Findings); *id.* at 138 (Order).  The CCA ordered additional briefing and heard oral argument, I SHCR-B at 138, seeking additional briefing on the underlying issues, "whether all questions asked and answers or statements obtained in a classification interview are admissible in court, or whether some questions asked and answers or statements obtained can exceed the scope of a permissible classification interview and become products of custodial interrogation," and "whether the question of why [Burton] committed the instant crime exceeded the permissible scope of the classification interview and became custodial interrogation," in addition to the question of counsel's performance.  I SHCR-B at 144.  The CCA ultimately remanded the

case to the trial court to consider previously unoffered evidence regarding whether the classification interview was a custodial interrogation and whether the sociologist was acting as a State agent. I SHCR-B at 147-49. The trial court again adopted the State's proposed findings and conclusions and recommended relief be denied. I SHCR-B at 185-200. The CCA then denied relief, concluding it could not fault trial counsel for failing to object when the particular underlying Fifth Amendment issue is unsettled. *Ex parte Burton,* No. AP 75,790, slip op. at 3-4 (Tex. Crim. App. Apr. 1, 2009).

The trial court entered specific findings that Burton failed to show that Guyton "was acting as an agent of the State so that *Miranda* warnings were required prior to [Burton's] routine prison classification interview consisting of questions that were not calculated to invoke incriminating responses and that were asked by someone whose function was to be a 'passive listening post,' rather than an investigator of criminal activities." I SHCR-B at 192, #1. Further, Burton failed to show that he was in custody beyond his incarceration for purposes of his judgment and sentence for the instant offense, *id.* at 192, #2, and failed to show custody given the non-threatening language used to summon him, the non-oppressive physical surroundings, the lack of confrontation of evidence of his guilt, the lack of additional pressure to detain him, and his freedom to refuse to participate in the interview. *Id.* at 193, #3. Burton failed

to show that his prison interview constituted custodial interrogation or that his constitutional rights were violated by the admission of Guyton's testimony. *Id.* at 193, #4. Therefore, the court found that Burton failed to prove ineffective assistance of counsel from trial counsel's failure to object to Guyton's testimony on these grounds. *Id.* at 194, #5; *see also id.* at 192, #40. Alternatively, the court concluded that any error in the admission of Guyton's testimony was harmless because Burton failed to show that the results would have been different in light of the facts of the crime, Burton's criminal history, and other punishment evidence. *Id.* at 194, #6. These findings are not unreasonable and are entitled to deference.

The Due Process Clause and the Sixth Amendment guarantee a defendant a right to a fair trial and the right to effective assistance of counsel at that trial. *Strickland,* 466 U.S. at 684-86. Claims of ineffective assistance of counsel are to be reviewed under *Strickland*'s two-prong standard, requiring a petitioner to show that counsel's performance was deficient and that the deficient performance prejudiced the defense. 466 U.S. at 684-86. A claim of ineffective assistance may be disposed of for want of either deficient performance or actual prejudice. *Id.* at 697.

To demonstrate deficient performance the petitioner must show that counsel's conduct falls beyond the bounds of prevailing, objective professional

standards. *Strickland*, 466 U.S. at 688. However, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Id.* at 689. There is a presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

A petitioner must also affirmatively prove prejudice by demonstrating that as a result of counsel's errors his trial was rendered fundamentally unfair or unreliable. Burton must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 529 U.S. at 391 (citing *Strickland*, 466 U.S. at 694). A "reasonable probability" is described as "probability sufficient to undermine confidence in the outcome." *Id.*

Burton fails to carry his burden of proving that trial counsel was ineffective for failing to object on these grounds. Trial counsel did attempt to keep Guyton's testimony out on other grounds but was unsuccessful. Any attempt to do so on these grounds would have been similarly unsuccessful for the reasons discussed in the previous section—namely, Guyton's interview was not a "custodial interrogation" but an attempt to obtain information for prison classification purposes. Because it was not a "critical stage" of the aggregate proceedings against Burton, *Estelle,* 451 U.S. at 470, neither *Miranda* warnings

-40-

nor the presence of Burton's appointed appellate counsel was necessary.  Any attempt to object to this testimony would have been fruitless, as the evidence was properly admitted.  And, even if admitted in error, its admission was harmless, as also discussed in the previous sections.  *See Gochicoa v. Johnson,* 238 F.3d 278, 286 (5th Cir. 2000) (holding that *Strickland* prejudice prong is not met if failure to preserve error is harmless). Therefore, Burton can demonstrate neither deficient performance nor prejudice, and relief on this claim should be denied.

## II.   The Trial Court Committed No Error in Refusing Burton's Request to Testify at Punishment Immune from Cross-Examination.  Therefore, Appellate Counsel Was Not Ineffective For Failure to Raise this Claim, and Burton Was Not Prejudiced.  (Claim 3 and 4)

Burton argues he was denied his "right of allocution."  Specifically he complains he was denied his right to present a final statement of remorse to the punishment-phase jury—prior to deliberation and free from cross-examination by the State—and was, thus, denied his Eighth Amendment right to present mitigating evidence.  Petition at 45; *see* 16 RR 108-10.  Relatedly, Burton argues that he received ineffective assistance of counsel from appellate counsel's failure to raise this claim on direct appeal.  Petition at 62.

These claims were raised and rejected on state habeas review.  First, the state habeas court found that, because appellate counsel did not raise this point of error on direct appeal, I SHCR-B at 128-29, #35, this "ground for relief need

not be considered in this or any subsequent habeas action." *Id.* at 130, #6. Alternatively, the court found the trial court properly denied Burton's motion to make a personal statement of remorse without being subject to cross-examination. *Id.* at 130-31, #7. The trial court noted that, during retrial on punishment, Burton filed a motion requesting to introduce a "statement of allocution" indicating his remorse for the crime, prior to jury deliberations, and free from cross-examination. *See* 16 RR 108-110. The trial court denied his request to introduce this statement without also giving the State the benefit of cross-examination. I SHCR-B at 127, #24, 25, 26. The state habeas court noted Burton's claim was not of the denial of allocution, but actually a claim of denial of his request to make a final personal statement to the jury without being subject to cross-examination, *id.* at 127, #27; *see id.* at 128, #32, and found that a defendant who takes the stand as a witness is subject to cross-examination and impeachment. *Id.* at 128, #33 (citing *Huffman v. State,* 746 S.W.2d 212, 219-20 (Tex. Crim. App. 1998); Tex. R. Evid. 611(b)).

And because the state court found the trial court properly denied Burton's motion, appellate counsel was not ineffective for failing to pursue a meritless issue on appeal. *Id.* at 130-31, #7, 8. Furthermore, Burton failed to demonstrate, but for the alleged error, the result of the proceeding would have been different. *Id.* at 131, #9. Burton failed to demonstrate harm because trial

counsel presented expert and lay witnesses regarding the special issues, and the jury heard evidence of Burton's alleged remorse. *Id.* at 131, #10, 11.  Further, the State's punishment argument that remorse must be "genuine" was a proper response to trial counsel's argument on remorse, and Burton cannot demonstrate harm from the trial court's denial of his motion to make a statement free of cross-examination. *Id.* at 132, #14. And any error in the State's arguments was not harmful in light of the evidence presented concerning the brutal offense. *Id.,* #15. The state court concluded Burton had failed to demonstrate his conviction was unlawfully obtained. *Id.* at 132, #16.

### A.   Burton has no right to testify free from cross-examination.

Burton argues he was denied his Eighth Amendment right to present mitigating evidence when the trial court refused to allow him to present a final statement of remorse, prior to jury deliberations, free from cross-examination by the State.  The state court correctly noted that any witness who takes the stand is subject to cross-examination.  I SHCR-B at 128, #33.  The state court's rejection of this claim is neither contrary to, nor an unreasonable application of, clearly established federal law.

No Supreme Court precedent suggests that a defendant should be permitted to testify without allowing the State the benefit of cross-examination. Indeed, in *Hill v. United States*, the Supreme Court held that there was no

constitutional violation arising from the trial court's violation of the federal procedural rule mandating that the court ask the defendant if he has anything to say before the sentence was imposed. 368 U.S. 424, 429 (1962). And the Fifth Circuit has specifically held that a defendant in a capital case did not have a constitutional right to make a statement of remorse without being subject to cross-examination. *United States v. Hall*, 152 F.3d 381, 397 (5th Cir. 1998), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000); *see also United States v. Jackson,* 549 F.3d 963, 980-81 (5th Cir. 2008) (citing *Hall* and finding one panel cannot overrule the decision of another panel), *cert. denied,* 130 S. Ct. 51 (2009).

The "overriding constitutional and statutory provisions" cited by Burton do not lend support to his argument. *See* Petition at 51-61. Indeed, *Huffman, see* Petition at 51, specifically states that "a defendant who takes the stand as a witness on the trial on the merits may be cross-examined and impeached in the same manner as any other witnesses." 746 S.W.2d at 219-20. Furthermore, *Penry v. Lynaugh,* 492 U.S. 302 (1989) (*Penry I*) and *Penry v. Johnson,* 532 U.S. 782 (2001) (*Penry II*), *see* Petition at 52, do not hold that a defendant must be allowed to present mitigating evidence not subject to cross-examination. These cases provide only that the jury must be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence." *Penry I,* 492 U.S. at 319;

-44-

*Penry II*, 532 U.S. at 797.  Thus, the jury must be given a vehicle to consider the proffered evidence—the mitigation special issue.  However, Burton was not *prevented* from presenting the potentially mitigating evidence.  He had to make a choice whether the benefit of taking to stand to express remorse would outweigh potential harm from cross-examination.  While the Fifth Amendment provides that no person "shall be *compelled* in any criminal case to be a witness against himself," *McKune,* 536 U.S. at 35, it does not prohibit requiring the defendant to make a difficult choice about choosing to testify.  *See McGautha v. California,* 402 U.S. 183, 213 (1971) ("It does no violence to the privilege [against compelled self-incrimination] that a person's choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case.")

Burton also cites to the admission of victim-impact testimony as additional "overriding constitutional and statutory provisions," suggesting that he now has an even greater need to address the jury personally.  Petition at 54-55.  However, once again, he is not *prevented* from addressing the jury personally.  He must simply decide whether the benefit outweighs the prejudice from this testimony.  The Fifth Circuit addressed a similar "procedural parity" argument in *Hall,* where it concluded that "no significant imbalance existed in the total advantages afforded" the parties at sentencing because Hall was allowed to

present evidence of a type similar to victim-impact testimony.  152 F.3d at 396.
That is, Hall could introduce hearsay evidence of his own remorse through his
sister, but the government could not cross-examine Hall.  Further, allowing Hall
to testify without cross-examination was only a marginal procedural advantage,
as the type of information the government would have sought to impeach Hall
with on cross-examination was already admitted as direct evidence of
aggravating factors, namely, Hall's prior convictions and unadjudicated offenses,
and evidence that, while in prison awaiting trial, he bragged about the crime,
threatened to kill a key witness, and talked of plans to escape incarceration by
taking his lawyer hostage with a knife.  *Id.* at 396-97.

*Hall* is instructive.  While Burton did not present similar hearsay evidence
of his remorse, he was able to present evidence—similar to victim impact— of his
own character and worth, and how his sentence could impact his family.  The
jury also heard some evidence of Burton's remorse when, on cross-examination,
the police officer who took his confession admitted that when Burton was asked
if the victim said anything to him, Burton "choked up," cried, got very emotional
and said the victim asked him if he knew God, and that she forgave him.  15 RR
205-07.  Finally, the jury heard that Burton had not been a disciplinary problem
the entire time he has been housed at TDCJ—approximately three years.  16 RR
106.  And, like Hall, even if Burton had been permitted to testify without cross-

examination, it would have provided only a marginal advantage, if any.  The jury had already heard evidence of Burton's extensive criminal record, the brutal facts of this crime, his police confession admitting guilt of this crime, and lack of remorse immediately after the murder and during his confession.  Thus impeachment with additional cross-examination of this sort was not likely to be more harmful, had he chosen to testify.  While the State did not have similar evidence of Burton's bad behavior while in prison, it did have compelling evidence of his *lack* of remorse, namely, that he returned home after committing the murder, laughing, smiling and acting as if nothing was wrong; and apart from his "choking up" one time, police officers felt Burton showed no emotion during his confession.  This evidence would have significantly countered Burton's claims of remorse issued after spending five years on prison death row.

Furthermore, none of the case law cited by Burton lends support for his position here.  *See* Petition at 57-61.  While other States may recognize a right of allocution without cross-examination, *see* Petition at 57, Texas does not.  *See Huffman,* 746 S.W.2d at 219; Tex. Code. Crim. Pro. Art. 42.07.  The cases cited in support of an Eighth Amendment and Due Process requirement that a defendant be allowed to make a statement of allocution—*see Moore v. City of Cleveland,* 431 U.S. 494, 503 (1977) and *In re Winship,* 397 U.S. 358, 361-62 (1970)—stand only for general constitutional propositions and have nothing to

do with allocution.  While *Boardman v. Estelle* holds that a defendant has a due

process right to address the court and express remorse prior to sentencing, it

does not suggest that due process allows this type of mitigating evidence to be

presented to a jury free from cross-examination.  957 F.2d 1523, 1525-26 (9th

Cir. 1992).  The Supreme Court's statement in *McGautha v. California*, that a

state is not "required to provide an opportunity for petitioner to speak to the jury

free from any adverse consequences on the issue of guilt" appears contrary to

Burton's position.  402 U.S. at 220.

*Lesko v. Lehman,* 925 F.2d 1527 (3rd Cir. 1991), and *State v. Cazes,* 875

S.W.2d 253 (Tenn. 1994), also do not provide support.  Petition at 49-51.  In

*Lesko,* the defendant testified at the penalty phase of his capital trial, presenting

mitigating testimony about his deprived childhood and family background, but

not about the merits of the charges against him.  He was not cross-examined by

the prosecution.  *Lesko,* 925 F.2d at 1540.  During the closing arguments, the

prosecutor called Lesko arrogant for complaining about his troubled childhood,

but for not apologizing for the crime.  *Id.*  Lesko challenged the remark as an

impermissible comment on his assertion of his Fifth Amendment rights.  *Id.* at

1541.  The Third Circuit concluded that the *Griffin*[13] rule, barring a prosecutor

from commenting to the jury on a defendant's failure to testify, applies to both

---

[13]        *Griffin v. California,* 380 U.S. 609 (1965)

phases of a capital trial, and "a capital defendant does not completely waive his *Griffin* rights by testifying at the penalty phase solely on mitigating factors that are wholly collateral to the merits of the charges against him." *Id.* at 1541-42. However, *Lesko* did not forbid "cross-examination or prosecutorial comment on matters reasonably related to his credibility or the subject matter of his testimony." *Id.* at 1542. In this case, Burton sought to exclude all cross-examination on his statement of remorse. However, an expression of remorse for the crime is not a matter "wholly collateral to the merits" of the charges. Indeed, Burton's testimony would also be an admission of guilt to the crime. By the logic of *Lesko,* the State should then be permitted to cross-examine him on not only his actual remorse, but his credibility. *Cazes*, which relies on *Lesko*, reaches the same conclusion: "[A] defendant may be completely and thoroughly cross-examined about all testimony given or fairly raised by that defendant on direct examination." 875 S.W.2d at 265-66. Burton claims that he should have been permitted to testify without *any* cross-examination by the State. *Lesko* and *Cazes* do not support this proposition.

Finally, any error was harmless as it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Burton was not harmed simply because the prosecution mentioned his

lack of remorse in closing arguments.[14]  Petition at 47-48.  As noted by the state
habeas court, the State's punishment argument that remorse must be "genuine"
was a proper response to trial counsel's argument on remorse.  I SCHR-B at 132,
#14; *see also Harris v. State,* 784 S.W.2d 5, 12 (Tex. Crim. App. 1989).[15]
Furthermore, while Burton now expresses remorse after five years in jail, at the
time he was interviewed by police and confessed to the killing, he did not cry,
appear sad, apologize, or show any signs of remorse, apart from "choking up" one
time.  15 RR 193-94.  Even if Burton had been permitted to express remorse at
the time of trial, the evidence still supported a State argument that he did not
show remorse at the time of the crime.  Moreover, his expression of remorse, five
years after the crime, was self-serving.  The fact that someone has remorse for

---

[14]      Burton refers to a portion of the prosecution's closing argument that
asserted:

> A life sentence—I know one of y'all said on voir dire a life sentence, 40
> years, God, that is tremendous punishment for someone who feels
> remorse.  That would be tremendous punishment to y'all if you committed
> a capital murder because you would have remorse, you would be
> genuinely sorry for what you did.  But for someone like him when it's just
> another day in his life, it's just something he couldn't help, 40 years
> would be a godsend.

17 RR 59.

[15]      However, any attempt to argue improper jury argument would have been
procedurally barred by Burton's failure to object to this argument at the time of trial.
*See Cockrell v. State,* 933 S.W.2d 73 (Tex. Crim. App. 1998) (holding defendant's
failure to object to jury argument forfeits right to complain of argument on appeal).

a crime *after* spending five years on death row, away from his own family, is not a true indication of his remorse for his crime, but of his remorse over his situation.  There is no reason to believe the jury would have lent this self-serving expression any more credence than it did the evidence that Burton "choked up" during his confession.  Especially given that his actions immediately following the murder (laughing about a flat tire on his bicycle and seeming normal, 16 RR 247-51) do not indicate remorse or concern for the murder he had just committed.

Burton has no right to testify free of cross-examination.  Therefore, the trial court committed no error in refusing his request, and Burton cannot demonstrate harm from the court's decision.  Relief on his claim must be denied.

## B.    Appellate counsel was not ineffective for failure to raise claim.

The Due Process Clause and the Sixth Amendment guarantee a defendant a right to a fair trial and the right to effective assistance of counsel at that trial, *Strickland,* 466 U.S. at 684-86, and on direct appeal.  *Evitts v. Lucey,* 469 U.S. 387 (1984).  As with Section I(B), *supra,* Burton must demonstrate both deficient performance and prejudice from appellate counsel's failure to this claim.  *See Strickland,* 466 U.S. at 697.

However, Burton fails to demonstrate either deficient performance or prejudice.  As support for deficient performance, Burton proffers the affidavit of

appellate attorney Robert S. Wicoff—who was not Burton's appellate attorney—who asserts generally, in his opinion, that Burton's appellate counsel was ineffective for failing to raise this claim. Petition Exhibit 5. Regardless of Wicoff's opinion, there is no requirement that appellate counsel raise every conceivable issue on appeal, especially when some may be without merit. *Evitts,* 469 U.S. at 394; *Jones v. Barnes,* 463 U.S. 745, 754 (1983). Indeed, it is his professional duty to choose among potential issues, according to his judgment as to their merit and his tactical approach. *Jones,* 463 U.S. at 754. And, even if the claim might have merit, appellate counsel has no constitutional obligation to raise every possibly meritorious challenge to a death sentence. *Id.* at 751-54 (explaining that defendant does not have constitutional right to have appellate counsel raise every "colorable" claim that defendant requests); *Engle v. Isaac,* 456 U.S. 107, 134 (1982) ("[T]he constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.") Burton fails to prove that appellate counsel decision not to raise an allocution-related claim was not the result of reasoned strategy.

Regardless, Burton must also demonstrate a reasonable probability that, but for appellate counsel's unprofessional errors, the result of his appeal would have been different. *Smith v. Robbins,* 528 U.S. 259, 285 (2000); *Lockhart v.*

*McCotter,* 728 F.2d 1275, 1283 (5th Cir. 1986).  Appellate counsel's failure to raise certain legal issues on direct appeal does not amount to the ineffective assistance of appellate counsel unless petitioner can demonstrate that these issues reflected trial errors of arguable merit.  *Robbins,* 528 U.S. at 285; *Hooks v. Roberts,* 480 F.2d 1196, 1198 (5th Cir. 1973).  The question is this: If counsel had preserved the issue, is it reasonably probable that Burton would have gotten a new sentencing hearing?  Burton's argument in support is meritless.

Burton admits that Texas has not changed its position as taken in *Huffman.* Petition at 63-64.  However, Burton maintains that the Fifth Circuit would reverse based on decisions of other jurisdictions.  Petition at 64.  But, as stated in the previous section, one panel may not overrule another, and the Fifth Circuit has refused to do so on this very issue.  *See Jackson,* 549 F.3d at 980-81; *Hall*, 152 F.3d at 397.  Therefore, there is no chance of reversal on appeal. Furthermore, the Court of Criminal Appeals alternatively reviewed this claim on the merits and concluded that it was meritless.  Therefore, Burton cannot demonstrate that, had appellate counsel raised this claim, the result of his appeal would have been different.  Counsel acted reasonably in not bringing this claim, and Burton has failed to demonstrate that counsel's decision was not reasonably strategy.  Therefore, relief on this claim must be denied.

### III.   Burton Fails to Make a Truly Persuasive Showing of Actual Innocence. (Claim 5)

In his final claim, Burton raises a free-standing claim of actual innocence, arguing that newly discovered evidence establishes his actual innocence of the murder of Nancy Adleman, and thus his execution would violate his Fourteenth Amendment right to due process.  Petition at 65.  Burton cites to three pieces of evidence that allegedly demonstrate his innocence: 1) a report from a pathologist hired by state habeas counsel indicating that the victim died at a time that would exclude Burton as the killer, Petition at 65-67; 2) the recantation of testimony by State witness Dedrick Vallery, who testified at trial that, while in Harris County Jail, Burton confessed to committing the crime, Petition at 68-69; and 3) a report from "a nationally recognized expert on police interrogation and false confessions," who concluded that Burton's police interrogation lacked plausibility and that his confession is likely false.  Petition at 70-72.

However, Burton fails to meet the extraordinarily high threshold of proof required to demonstrate actual innocence and is not entitled to federal habeas relief on this claim. *Herrera v. Collins*, 506 U.S. 390, 400, 417 (1993).  Burton fails to proffer newly discovered evidence, or make a "truly persuasive showing" of actual innocence.  Therefore, relief on this claim must be denied.

Newly discovered evidence—if it exists—must bear upon the constitutionality of the applicant's detention. *Townsend v. Sain,* 372 U.S. 293,

317 (1963).  Therefore, a "truly persuasive showing" of actual innocence, may act

as a "gateway" to review an otherwise procedurally barred claim.  *See Herrera,*

506 U.S. at 404, 417; *Schlup v. Delo,* 513 U.S. 298, 315 (1995).   However, to

obtain relief based on actual innocence, "the evidence must establish *substantial*

doubt about his guilt[.]"  *Dowthitt v. Johnson,* 230 F.3d 733, 741 (5th Cir. 2000)

(emphasis in original).  In this instance, Burton must show that a constitutional

violation "has  probably  resulted  in  the  conviction  of  one  who  is  actually

innocent." *Lucas v. Johnson*, 132 F.3d 1069, 1077 (5th Cir. 1998)(citing *Schlup,*

513 U.S. at 321).  To show that he is "actually innocent" Burton must "show that

it is more likely than not that no reasonable juror would have found [him] guilty

beyond a reasonable doubt . . . in light of all of the evidence, including that

alleged . . . to have become available only after the trial."  *Id.*  Burton fails to

make such a showing; thus consideration of any procedurally barred claim is

foreclosed.

### A.    State court findings

Burton presented this argument and evidence in his first state habeas

writ.  *See* I SHCR-A at 18.  The CCA denied relief, adopting the extensive factual

findings and legal conclusions of the state court.  *See* V SHCR-A 733-36, 738-44,

759-60, 762-

The state habeas court concluded that Burton was actually attacking the

sufficiency of the evidence to support his conviction and the sufficiency of the evidence to support the admissibility of his confession and that such claims were not cognizable in habeas proceedings.  V SHCR-A at 744, #53; 759, #1; *id.* at 762, #10.  Alternatively, the court concluded that Burton had failed to show that this evidence was "newly discovered evidence, i.e., evidence that was unknown or unavailable to him at the time of his trial."  V SHCR-A at 759, #2 (citing *Ex parte Brown,* 205 S.W.3d 538, 545 (Tex. Crim. App. 2006)).

Finally, the court concluded that Burton "fails to show by clear and convincing evidence that, despite the evidence of guilt that supports [Burton's] conviction, no reasonable juror could have found him guilty in light of the alleged 'newly discovered evidence' regarding the complainant's time of death, hair analysis,[16] and [Burton's] statements."  V SHCR-A at 759, #3.  The court also concluded the trial court did not abuse its discretion in concluding that Burton's confession was voluntary and admissible.  V SHCR-A at 763, #12, 13.   And "[b]ased on the unpersuasive and incredible nature of Dedrick Vallery's 2001 habeas assertions, [Burton] fails to show by clear and convincing evidence that, despite the evidence of guilt that supports [Burton's] conviction, no reasonable juror could have found him guilty in light of Vallery's 2001 assertions."  V SHCR-

---

[16]   On state habeas, Burton also argued that hair-analysis evidence demonstrated his actual innocence.  This argument was abandoned in these proceedings.

A at 760, #4.  These findings are not unreasonable and are entitled to deference.

**B.   Burton's evidence is not "newly discovered" nor does it raise sufficient doubt about his guilt.**

If this Court were to view Burton's actual-innocence claim as a gateway to reviewing some procedurally barred claim, Burton must first raise "sufficient doubt about his guilt" before the court could examine the barred constitutional claim.  *Schlup*, 513 U.S. at 316; *see Dowthitt*, 230 F.3d at 741.  Burton's proffered evidence fails to raise such doubt.

As support for this claim, Burton proffers 1) a report from a pathologist indicating that the victim died at a time that would exclude Burton as the killer, Petition at 65-67; 2) the recantation of Dedrick Vallery's testimony, Petition at 68-69; and 3) a report indicating Burton's police confession was likely false. Petition at 70-72.  However, the state court reasonably concluded that Burton failed to show by clear and convincing evidence that no reasonable juror could have found him guilty in light of the alleged newly discovered evidence.  V SHCR-A at 759-60, #3, 4.

**1.   This evidence is not "newly discovered."**

As an initial matter ,the state court correctly concluded that Burton failed to show that this evidence was "newly discovered evidence, i.e., evidence that was unknown or unavailable to him at the time of his trial."  V SHCR-A at 759, #2; *see also id.* at 736, #23 (the evidence relied upon by Dr. Radelat was known

at the time of Burton's trial and does not constitute newly discovered evidence); *see also Lucas,* 132 F.3d at 1075 n.3 (claim of actual innocence grounded in newly discovered evidence must demonstrate, among other things, that failure to detect evidence not due to lack of diligence).

The opinions of Dr. Paul Radelat and Dr. Richard Leo were certainly available at the time of trial, as these doctors' opinions were derived from reviewing evidence admitted during trial. Dr. Radelat reviewed autopsy photographs, medical examiner's records, and witness statements and testimony. *See* Petition Exhibit 7. Dr. Leo reviewed the circumstances of Burton's interrogation, Burton's account of what occurred, crime scene evidence, and witness testimony. Petition Exhibit 9 at 9-17.[17] Neither doctor asserts, nor does Burton allege, that the methods used to arrive at their opinions are new or were unavailable at the time of trial. Apart from Dedrick Vallery's alleged recantation, neither opinion is based on new evidence. Furthermore, the veracity of Burton's confession was a factor known to Burton prior to trial, of which he should have alerted counsel. Certainly, with some diligence, Burton could have presented these opinions as expert testimony to counter the credibility of the State's evidence at the time of trial. He did not.

---

[17] The only evidence reviewed by Dr. Leo not admitted at trial was Dedrick Vallery's recantation. Petition Exhibit 9 at 16. However, as will be discussed, this evidence was also discoverable.

Regarding Dedrick Vallery's recanted testimony, Petition Exhibit 8, Burton knew at the time of trial what he told Vallery. Therefore, if Vallery's recantation is true, then Burton could have told trial counsel what really happened and trial counsel could have cross-examined Vallery with this information at trial. Burton fails to demonstrate that this impeachment evidence was undiscoverable.

> ### 2. This evidence does not raise a sufficient doubt about Burton's guilt.

> #### a. Time-of-death argument

Burton argues that the State's entire case is premised on the murder occurring between 7:30 and 8:00 p.m., but, according to Dr. Paul Radelat, the victim died much earlier, at a time that would exclude Burton as the killer. Petition at 65-67; Petition Exhibit 7.

> The state habeas court rejected this argument, specifically finding that

> State's witnesses Mark Adelman, Sharon Lalen, Shirley Simeon, and Diane Phommasone and defense witnesses Brenda Francis, Felicia Batts, Arthur Burton, Sr., and [Burton] gave time approximations, not exact times, for July 29, 1997, and that the complainant's time of death was placed within a twelve-to-twenty-four [hour] window before the discovery of her body mid-morning on July 30, 1997.

V SHCR-A at 734-35 #19. Further, the court found "unpersuasive" the assertions of Dr. Paul Radelat "that the complainant died 'significantly before 7:30 p.m.' on July 29, 1997, based on Radelat's review of autopsy photos, crime

scene photos, medical examiner's records, and trial testimony and [Radelat's] observation of an *unidentified* stage of development of fly larvae on the complainant's body." V SHCR-A at 735-36, #22 (emphasis in original).  Finally, the court found Burton's claim of actual innocence based on the complainant's time of death and the witnesses' estimations of time was actually an attack on the sufficiency of the evidence, and a reasonable juror could have still convicted Burton even if this evidence were considered.  *Id.* at 736, #23, 24.  These findings were not unreasonable.

The state correctly noted that Dr. Radelat's opinion is merely an attack on the sufficiency of the evidence. Radelat's opinion could have been presented at trial for the jury to consider as rebuttal to the State's numerous witnesses suggesting a time-line of the murder, but does not conclusively establish a time of death or that the State's theory of the case is wrong. *See Vega v. Johnson*, 149 F.3d 354, 364 (5th Cir. 1998) (holding that newly discovered evidence demonstrating actual innocence must be "material, not merely cumulative or impeaching").

Furthermore, it is not likely a reasonable juror would have found Burton not guilty in light of Dr. Radelat's opinion.  First, Radelat states generally that the time of death was significantly before 7:30 p.m, a time of death that Burton claims causes the State's case to "fall apart."  But no witness at trial was precise

in his or her recollection of time.  Mark Adleman last saw his wife as she left to go jogging some time after 7:00 p.m. but before 8:00 p.m.  21 RR 21; Petition Exhibit 6.  Diane Phommasone testified she heard a scream around 7:45 or 7:50 p.m, about fifteen minutes after she last saw the person on the bike.  21 RR 122-23.  Sharon Lalen testified she saw Burton riding his bike and the victim jogging simultaneously around 6:00 p.m.  21 RR 70.  Shirley Simeon saw the victim jogging, Burton biking, and Lalen running after her children sometime in "late afternoon" after 5:00 p.m.  21 RR 101, 112.  Burton testified that his bike ride lasted twenty or thirty minutes, beginning around 7:00 p.m.  24 RR 59; SX 1, 1A, 2.  Brenda Francis and Felicia Batts testified that Burton was at his father's house sometime after 6:00 p.m., was gone around 7:45 p.m., and returned around 8:00 p.m.  23 RR 239-40, 258-61.  Therefore, the evidence was clearly in conflict as to what time the parties were spotted on the trail.

While Radelat estimates the time of death as "significantly before 7:30 p.m.," Radelat does not define "significantly."  Given that witness testimony places Burton and the victim on the trail as early as 5:00 p.m.—two and a half hours before 7:30—Radelat's opinion does not appear to exclude Burton. Further, the State's expert testified that the time of death could not be determined and could, at best, be twelve to twenty-four hours before the body was discovered some time the morning after the victim disappeared.  23 RR 143,

186-87. Therefore, Dr. Radelat's opinion on time of death could certainly fall within the medical examiner's twelve-to-twenty-four-hour range.

The state court reasonably determined that Radelat's opinion is "unpersuasive." V SHCR-A at 735-36, #22. While both the medical examiner and Dr. Radelat are board certified by the American Board of Pathology, *see* 23 RR 143, the medical examiner is more credible in this matter as he actually conducted the autopsy on Nancy Adleman. Dr. Radelat merely examined photographs, testimony, and statements. Further, Radelat offers only a general opinion that the time of death was significantly before 7:30 p.m., but does not define "significantly." Radelat's opinion is based on "the stage of development of fly larvae on Ms. Adelman's body." Petition Exhibit 7 at 1. However, Radelat did not actually examine the body, explain any of his findings, or discuss how he arrived at his conclusions. Nor did he explain his qualifications to testify about fly larvae development or even identify what photographs and evidence led him to reach his conclusions regarding larvae development. Because Radelat's opinion lacks the credibility of the medical examiner's opinion, and merely conflicts with some of the already-conflicting evidence admitted at trial, Burton fails to show that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt[.]" *Lucas*, 132 F.3d at 1077. Where, as in this case, the state court has already made credibility

determinations pertaining to a particular witness, those findings are afforded deference under AEDPA. *Summers v. Dretke*, 431 F.3d 861, 871-72 (5th Cir. 2005). "A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts." *Pippin v. Dretke*, 434 F.3d 782, 791 (5th Cir. 2005) (citing *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir.1999)).

### b.   Dedrick Vallery

Burton next argues that State's witness Dedrick Vallery—who testified at trial that Burton confessed the killing to him while in jail—has recanted his testimony, now claiming Burton only described the crime he was charged with, but never told him that he actually raped and murdered the victim. Petition at 68; Petition Exhibit 8.[18]   Vallery now claims the police threatened to "put [him] away for as long as [Burton]" if he did not testify against Burton. Petition Exhibit 8.

Regarding the Dedrick Vallery recantation, the state court found Vallery's affidavit "unpersuasive and incredible." V SHCR-A at 740, #41. And based upon the unpersuasive and incredible nature of Vallery's affidavit, the court found

---

[18]     Burton alleges now that the police threatened to arrest Vallery's mother if he did not testify against Burton. Petition at 69. Vallery's affidavit does not support this assertion in any way.

that Burton failed to show by clear and convincing evidence that no reasonable juror would have found him guilty in light of Vallery's assertions.  *Id.* at 760, #4.

The court's credibility determination is entitled to deference.  *See Summers,* 431 F.3d at 871-72.  Vallery's post-trial recantation should be viewed with "extreme suspicion."  *See United States v. Adi,* 759 F.2d 404, 408 (5th Cir. 1985) (courts view recanting affidavits and witnesses with "extreme suspicion").  Claims of actual innocence must be supported with new, *reliable* evidence.  *Schlup,* 513 U.S. at 324.  The fact that Vallery was not willing to provide this favorable testimony until this time makes the credibility of this evidence highly suspect.  *See Herrera*, 506 U.S. at 417-18 (affidavits filed eight years after trial, with no satisfactory reason for 11th hour admission, after alleged perpetrator is dead, are suspect); *see Drew v. Scott,* 28 F.3d 460, 463 (5th Cir. 1994) (court had little confidence in co-defendant's postsentencing truth experience because he had nothing to lose by incriminating himself after receiving sixty-year sentence).

Vallery's trial testimony indicated that he approached the Harris County deputies about Burton's admission and that no one promised him anything in exchange for his testimony.  22 RR 24, 45, 50, 56-57.  Detective Ben Beall confirmed on habeas review that Vallery approached them, that the officers did not pressure Vallery, and that he was not threatened into providing testimony.  V SHCR-A at 787. As noted by the state court, Vallery's post-trial recantation

is simply not credible.  V SHCR-A at 739-40, #40, 41.

Regardless, the state court also reasonably found that reasonable jurors could have convicted Burton on the evidence of guilt, even considering Vallery's current habeas assertions.  V SHCR-A at 740, #42.  First, the fact that Burton did not actually tell Vallery that he committed the crime is not necessarily exculpatory.  Vallery does not allege that Burton told him he was innocent, only that he did not say to him he committed the crime.  Second, Vallery's credibility was significantly challenged during trial, and it is likely the jury considered his testimony with skepticism.  *See Vega*, 149 F.3d at 364 (holding that newly discovered evidence demonstrating actual innocence must be "material, not merely cumulative or impeaching").  Vallery testified at trial that he had a criminal record, had served time in jail, and spent a significant amount of time in lock-down. 22 RR 23-24, 35-41. On cross-examination trial counsel questioned why Burton would confess to him so soon after meeting him, 22 RR 45-46; Vallery's inability to testify without looking back on his statement, 22 RR 47-48; and whether he was hoping to get a benefit for testifying, 22 RR 51.  Most significant, after testifying that he saw scratches on Burton's back while in jail, scratches which Burton claimed were caused by the victim, Vallery was shown a photograph of Burton taken shortly after he was booked into jail that showed no scratches.  22 RR 29, 31,34-35; 23 RR 89-90; SX 63.  Burton himself denied

ever meeting Vallery or discussing the crime with him.  24 RR 55-56.  Therefore, the jury was given every reason to discount Vallery's testimony, but nevertheless convicted in light of Burton's confession and eyewitness testimony placing him at the scene at the same time as the victim.  Therefore, reasonable jurors could have convicted Burton.

### c.    Police confession

Finally, Burton offered the opinion of Dr. Richard Leo—an expert on police interrogations and false confessions—who opined that Burton's confession was likely coerced and false.  Petition at 70-72; Petition Exhibit 9.  However, the state habeas court found Dr. Leo's opinion that Burton was suggestible and vulnerable to interrogation and that he could not have made a voluntary statement "unpersuasive and unsupported."  V SHCR-A at 743, #50.  This finding was based on Dr. Leo's acknowledgment that he was not present and could not know what transpired during Burton's police questioning.  *Id.*  The court also found that this claim of actual innocence based upon Burton's confession was actually an attack on the sufficiency of the evidence and voluntariness of  his confession, and that any reasonable juror would have convicted Burton even weighing the inconsistencies of his confession against the evidence of guilt.  V SHCR-A at 744, #53.

These findings are once again entitled to deference.  Dr. Leo was not

present during the confession, and as he acknowledged, it was not transcribed or videotaped; therefore, he does not know what actually took place during that interrogation.  Petition Exhibit 9 at 9, 11.  Indeed, Dr. Leo acknowledged that "no one, including myself, can know what exactly transpired during this interrogation" and "even the participants' recollections are imperfect and may change or distort over time".  Petition Exhibit 9 at 11.  Nevertheless, Dr. Leo rejected the recollections of three Harris County detectives in favor of Burton's self-serving version of the interrogation.  *See* Petition Exhibit 9 at 13, 17; *see also* V SHCR-A at 741-43, #44-49.  Therefore his speculative opinion lacks reliability.  The state court specifically found that Burton was not forced to give a statement and that it was free and voluntary.  V SHCR at 743, #49; *id.* at 763, #12, 13.  This finding is reasonable and entitled to deference.  *See Summers,* 431 F.3d at 871-72 (where state court makes credibility determinations pertaining to a particular witness, those findings are afforded deference under AEDPA).

Dr. Leo also acknowledged that the statement, even if coerced, may nevertheless be true.  Petition Exhibit 9 at 13.  While Dr. Leo believed this statement was false, his opinion does not make it so.  His opinion was, at best, additional impeachment of the State's use of Burton's statement and of Detective Beal and Sergeant Schwenk's testimony regarding voluntariness, *see* 23 RR 50-59 (Sargent Schwenk); 73-94, 111-38 (Detective Beal); 24 RR 30-52,83, 89-98

(Burton, Jr.), and is insufficient to prove actual innocence.  *See Vega*, 149 F.3d at 364.  Therefore, the state court's finding that this claim amounts to an attack on the sufficiency of the evidence is reasonable.

Furthermore, Dr. Leo's opinion was also cumulative of Burton's testimony that he was forced to confess under great psychological pressure and physical force.  24 RR 28-51; *see also* 23 RR 225-26 (Burton, Sr.), 246-47 (Batts).  When requesting relief on the basis of newly discovered evidence, the defendant must show, among other things, that the evidence was "material, not merely cumulative or impeaching; and . . . the evidence would probably produce acquittal at a new trial."  *Lucas,* 132 F.3d at 1075 n.3 (*citing* United States *v. Freeman,* 77 F.3d 812, 817 (5th Cir. 1996)); *Vega*, 149 F.3d at 364.  This evidence was merely cumulative of Burton's own testimony at trial and lacks any personal knowledge of the circumstances of the police interview.  Thus, it does not raise a sufficient doubt as to Burton's guilt.  *Schlup,* 513 U.S. at 316; *see Dowthitt,* 230 F.3d at 741.

Contrary to Dr. Leo's assertions, the evidence does link Burton to the crime scene.  As discussed in Section III(B)(2)(a), *supra,* numerous witnesses saw Burton and the victim on the trail around the same time.  Dr. Radelat's opinion on time of death does not exculpate Burton, especially given that few witnesses could agree on time.  Dr. Leo alleges there was no physical evidence.  However,

hairs collected from both the victim and from Burton displayed an unusual, infrequently seen "hinged" characteristic, and Burton could not be excluded as a donor.  23 RR 10-18, 23-33.

Burton fails to "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt" had he produced the evidence set forth in this petition at the time of trial.  *See Lucas,* 132 F.3d at 1077.  The evidence he proffers should have been presented at the time of trial, lacks credibility, and is merely cumulative of other evidence already offered or provides only impeachment value.  Burton fails to raise a "sufficient doubt about his guilt."  *Schlup,* 513 U.S. at 316.  Therefore, the state court's findings were neither incorrect nor an unreasonable application of clearly established federal law and were entitled to deference.

Burton fails to meet the extraodinarily high threshold of proof required to demonstrate actual innocence and is not entitled to federal habeas relief on this claim.  *Herrera*, 506 U.S. at 400, 417.  Both the state court and the clemency process are amendable to claims of actual innocence.  *See, e.g., Ex Parte Elizondo,* 947 S.W.2d 202 (Tex. Crim. App. 1997).  Burton has sought relief from the state court to no avail.  None should be granted by this Court.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that Burton's

federal petition for writ of habeas corpus be denied with prejudice on the merits, and that no certificate of appealability issue with regard to any of the claims raised therein.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

ERIC J. R. NICHOLS
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

/s/ Tomee M. Heining

*TOMEE M. HEINING

*Attorney in charge

Assistant Attorney General
Texas Bar No. 24007052
Southern District Admission No. 25024
Office of the Attorney General
Postconviction Litigation Division
P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
Telephone: (512) 936-1600
Telecopier: (512) 320-8132

ATTORNEYS FOR RESPONDENT

-70-

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2010, I electronically filed the foregoing document with the clerk of the court for the United States District Court, Southern District of Texas, using the electronic filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who has consented in writing to accept this Notice as service of this document by electronic means: James R. Reed.


/s/ Tomee M. Heining

_____
TOMEE M. HEINING
Postconviction Litigation Division